Angelo FIATARUOLO, Angelo
Veno, Plaintiffs–Appellees,

v.

UNITED STATES of America,
Defendant–Appellant.

Nos. 969, 1292, Dockets 92–6169, 92–6177.

United States Court of Appeals,
Second Circuit.

Argued Feb. 10, 1993.

Decided Nov. 3, 1993.

Kenneth L. Greene, Washington, DC (James A. Bruton, Acting Asst. Atty. Gen., Albert S. Dabrowski, U.S. Atty., Gary R. Allen, Sara S. Holderness, Tax Div., Dept. of Justice, of counsel), for defendant-appellant U.S.

Kurt F. Zimmermann, New Haven, CT (Silverstein & Osach, P.C., Connecticut, of counsel), for plaintiff-appellee Angelo Veno.

Jeremiah Donovan, Old Saybrook, CT, for plaintiff-appellee Angelo Fiataruolo.

Before: VAN GRAAFEILAND, KEARSE, and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

It is our task on this appeal to decide who was in control of a construction contractor's finances. On the resolution of this issue hinges liability for the payment of federal withholding taxes. The government claims the two taxpayers before us had significant authority over the contractor's finances and should be held responsible for payment of the taxes due. Taxpayers insist they had no say in the family-run construction business, and that their only connection to it was as partners on jointly bid construction projects; whatever dominion they exercised, taxpayers continue, ended at the shoreline of the co-venture projects, never extending into the sea of the contractor's corporate finances.

In October 1989 Angelo Veno and Angelo Fiataruolo (taxpayers or appellees) brought suit in federal court seeking refunds of tax penalties assessed against them. Their case was tried before a jury in the United States District Court for the District of Connecticut (Daly, J.), and they were found not responsible for the federal withholding tax deficiency of a corporate employer. On the same day Judge Daly entered judgments in favor of Fiataruolo and Veno. The United States Internal Revenue Service (IRS, government or appellant) thereafter made timely motions for judgment notwithstanding the verdict on the ground that the taxpayers were legally responsible for the tax shortfall, and for a new trial due to perceived evidentiary errors. The district court denied these motions and entered final judgment for the taxpayers.

## BACKGROUND

C & C Security Specialists, Inc. (C & C Security or contractor) was a construction firm that specialized in installing · security systems, windows, and doors in various commercial and prison buildings. Founded in the late 1970s by Del Cernuda and Frank Cifuni, Sr., now deceased, the firm was operated by and employed various members of the Cifuni and Cernuda families. For example, Del Cernuda served as corporate president and managed the daily operations; Frank Cifuni's daughter Dian was the corporate secretary responsible for internal bookkeeping. Another Cifuni daughter, Francis, prepared quarterly employment returns, and together with Dian, computed the company's payroll. The contractor was located in New York State until 1986 when it moved to Westport, Connecticut.

In early 1985 Del Cernuda began looking for investors to provide C & C Security with additional capital so that the firm could bid on larger construction projects. To this end he made several financial presentations to two potential Connecticut-based investors, appellees Angelo Veno and Angelo Fiataruolo. Meetings among the three men culminated in the signing of a two-page "Co–Venture" letter on March 21, 1985.

This letter provided that after review and approval of each proposed co-venture construction. job, Veno and Fiataruolo would make "occasional loans" to the contractor on a project-by-project basis. Loans made by Fiataruolo and Veno were to be repaid before any profit distributions. The Co–Venture letter also set out the responsibilities of the parties:

> Cernuda and C & C Security Specialists, Inc. shall be responsible for field installations, including supervision of labor, purchase of materials, and job management. Veno and Fiataruolo shall be responsible for financial and general administrative functions, including payments and receipts from the various jobs undertaken by the co-venture....

The letter further provided that "more detailed documentation" defining the exact nature of the co-venture arrangement would be prepared and signed by the parties.

Such documentation followed on March 27, 1985. On that date A.J. Veno Construction Company, Inc. (Veno Construction), of which Veno was the president and sole shareholder,

entered into a 16-page Construction Finance Management Contract (Finance Contract) with C & C Security. According to the agreement, C & C Security would submit proposed projects to Veno Construction, and if Veno Construction wished to participate in the project it would advance to the contractor up to $250,000 in the form of a working capital loan that would be secured by a formal note and repaid at a rate set out in a schedule. If, on the other hand, Veno Construction was not interested in the proposal, C & C Security could at its sole discretion pursue the work independently.

The contract designated Veno Construction as the "Construction Finance Manager" and gave it responsibility for financial management of all jointly pursued projects. It was held responsible for, *inter alia*, (1) insuring "proper accounting, auditing and payment of all job costs"; (2) providing "for the proper disbursements and cost accounting in accordance with Contract requirements"; (3) performing "such audit functions as required to ensure validity of Project costs and operations"; and (4) "periodically up-dat[ing] the cash outflow requirements." In carrying out these obligations, Veno Construction was required to maintain its independence from C & C Security. Accordingly, Angelo Veno could neither "claim to be an officer or employee of the Contractor" nor "make any claim, demand or application to or for any right or privilege applicable to an officer or employee of the Contractor...."

The Finance Contract was signed by Del Cernuda on behalf of C & C Security and Angelo Veno for Veno Construction. Angelo Fiataruolo was not a signatory to the document and is not mentioned in it. Although Fiataruolo was not a stockholder, director, officer or employee of Veno Construction, the parties understood that his role was to assist Veno Construction in carrying out its financial and administrative functions under the accord.

The co-venture was, according to Fiataruolo, off and running almost immediately and an initial loan of $50,000 was advanced to C & C Security the day after the Finance Contract was signed. During the spring of 1985 Veno Construction loaned approximately $200,000 to the contractor by transferring money from Veno Construction's bank account in Connecticut to C & C Security's primary account in Nanuet, New York. Expenses for the co-venture's projects were then paid out of the Nanuet account either by Del Cernuda or one of the Cifuni sisters. Such disbursements were later reviewed by Veno and Fiataruolo.

As Veno Construction continued to extend more credit to the contractor, it sought to verify that the firm's money was being used solely for co-venture projects. Accordingly in March 1985 Fiataruolo and Veno hired Wayne Troy to work part-time in C & C Security's Nanuet office to review the contractor's books and records. In the early summer of 1985 Troy discovered that the contractor had failed to remit sufficient payroll withholding taxes to the IRS for the first two quarters of the fiscal year. He advised Fiataruolo and Veno of this problem; they informed Del Cernuda, who then remedied the matter.

In part to further tighten control over the disbursement of co-venture funds, Fiataruolo and Veno in July 1985 joined Cernuda in establishing an account in the name of C & C Security at the Connecticut Bank & Trust Co. in Westport, Connecticut. Veno, Fiataruolo, and Cernuda all had signature authority over this account; the checkbook was maintained by Fiataruolo and bank statements were sent to Veno Construction. Money deposited into the account consisted of both loan money from Veno Construction and funds collected by C & C Security from co-venture construction projects. Disbursements from the account were made according to lists provided by Dian or Francis Cifuni. The Cifunis generally prepared checks used to make payments for operating expenses, payroll, and payroll tax deposits, which were signed by one of the three signatories on the account.

Despite the opening of the Connecticut account, C & C Security continued to retain several other bank accounts over which Fiataruolo and Veno had no authority. For example, one active account was maintained at a branch of the Chemical Bank in New York City to disburse a large payroll on a

New York-based construction job. Because the workers' union required that pay checks be drawn on a New York account, the contractor could not make this payroll out of Connecticut. Instead, money was wired to Chemical from Connecticut Bank and Trust on a regular basis to pay the union's wages.

### PRIOR PROCEEDINGS

With that background in mind, we come to the events that brought about the present litigation. C & C Security failed to pay withholding taxes to the federal government for the last two quarters of 1985 and the first two quarters of 1986. The IRS determined that Cernuda, Fiataruolo, and Veno were the persons responsible for the payment of these taxes. It brought suit against Cernuda in the United States District Court for the Southern District of New York and obtained a judgment against him. The IRS also assessed penalties against Fiataruolo and Veno in the amount of $170,439.92. Fiataruolo and Veno paid, respectively, $1,877 and $3,133 in partial satisfaction of the assessments and then filed separate suits in the United States District Court for the District of Connecticut seeking abatement of the assessments and refunds of the taxes paid and credits applied.

Judge Daly consolidated the two cases for a jury trial that commenced on October 31, 1991. The issue before the jury was whether under § 6672 of the Internal Revenue Code, 26 U.S.C. § 6672 (1988 & Supp. III 1991), Fiataruolo and Veno were persons responsible for the collection and payment of C & C Security's withholding taxes, and if so, whether they "willfully" failed to make such withholding payments.

At trial, Fiataruolo and Veno maintained that the tax deficiencies arose out of the C & C Security accounts that they did not control. They also asserted that Dian Cifuni carried out an active practice of deception to hide the contractor's IRS problems from them. The appellees further stated they had no idea that the contractor was behind in its payroll tax withholding payments and that the IRS levy came as a complete surprise to them. The government presented evidence to the contrary, relying in part on the testimony of Dian Cifuni and Del Cernuda.

At the conclusion of the government's case, defense counsel for Fiataruolo called certified public accountant Lewis Cohen to testify as an expert witness and asked him: "Based on your review of the [Connecticut Bank & Trust Co.] account and your own experience with the Internal Revenue Service as a certified public accountant, have you come to an opinion as to whether Angelo Fiataruolo was a *responsible person* with respect to ... withholding taxes due and payable?" (emphasis added). The IRS objected to this query because Cohen had not been offered to testify on these matters and the question called upon him to draw a legal conclusion. The trial court overruled the objection, stating that the question is "not all legal, and I think he is entitled to express his opinion." It instructed the jury that although Cohen's view was not binding, "it's something you can consider if you wish to." Cohen then responded to Fiataruolo's question: "[B]ased on the evidence that I looked at and the work that I did, I did not believe that Mr. Fiataruolo was a responsible party in connection with this matter."

On November 4, 1991 the jury returned verdicts on special interrogatories finding Veno and Fiataruolo were *not* parties responsible under § 6672 for C & C Security's unpaid taxes. As a result of that finding, the jury did not need to reach the second question under the statute: whether the failure to pay taxes was "willful." On the same day, the district court entered judgments for Fiataruolo and Veno: "It is Ordered and Adjudged that judgment be, and hereby is entered in favor of the plaintiff[s]."

Two weeks later the government moved for judgment notwithstanding the verdict, contending that the taxpayers were responsible for paying withholding taxes as a matter of law, and also moved for a new trial, alleging that various errors were made in the admission of evidence. The government also filed a motion to amend the district court's November 4 judgments on the ground that the "consolidated action requested a refund and the judgment fails to order payment." It proposed a final judgment that read:

IT IS HEREBY ORDERED THAT JUDGMENT IS ENTERED in favor of plaintiff, Angelo Fiataruolo and against the United States of America, in the amount of $1,520.00 plus interest from the date of payment.

IT IS FURTHER ORDERED THAT JUDGMENT IS ENTERED in favor of the plaintiff, Angelo Veno and against the United States of America, in the amount of $293.00 plus interest from the date of payment.

The district court denied all three motions on May 11, 1992. It rejected the motion for j.n.o.v. because it believed there was sufficient evidence on the record to support the jury's findings and it thought its evidentiary rulings were correct. The trial court also rejected as "moot" the IRS' motion to alter the November 4 judgments. It then entered separate judgments in favor of the appellees on June 17, 1992. The judgments read:

ThE [sic] Court having filed its Rulings dated May 11, 1992 and having ordered that judgment shall enter in favor of the plaintiff and against the government ... and further Ordered the government to refund all monies held in full or partial satisfaction of the penalties assessed against the plaintiff plus interest from the date of payment,

It is therefore ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of the plaintiff as against the government and the government is ordered to refund all monies held in full or partial satisfaction of the penalties assessed against the plaintiff[s] plus interest from the date of payment, in accordance with the Court's orders.

From these judgments the government appeals.

## DISCUSSION

### I Appellate Jurisdiction

■ At the outset we must consider whether we have jurisdiction to hear this appeal under 28 U.S.C. § 1291 (1988), which provides that "courts of appeals ... shall have jurisdiction of appeals from all *final decisions* of the district courts." (emphasis added). The IRS questions whether the judgments of June 17 are final because they fail to include the amount of the taxpayers' monetary awards. Such specification, the IRS insists, is a necessary element of a final judgment in a tax action suit seeking an award of money. For this position the government relies on *United States v. F. & M. Schaefer Brewing Co.*, 356 U.S. 227, 232–33, 78 S.Ct. 674, 678, 2 L.Ed.2d 721 (1958). In that case the Supreme Court stated that a district court's failure to specify the dollar amount of a money judgment was "strong evidence" that the court did not intend its action to be a final appealable decision.

*Schaefer* was a suit brought by the brewing company to recover stamp taxes assessed against it. The taxpayer filed a complaint and moved for summary judgment, which the district court granted on April 14, 1955. The clerk of the court made a notation the same day on the civil docket: "Decision rendered on motion for summary judgment. Motion granted. See opinion on file." *Id.* at 229, 78 S.Ct. at 676. Thereafter, on May 24, 1955, the district court entered a formal document captioned "Judgment," which specifically called for Schaefer to "recover of the defendant, United States of America, the sum of $7,189.57 and interest thereon ... in the amount of $542.80." *Id.* The government appealed in July and the taxpayer moved to dismiss on the grounds that the district court's April 14 decision constituted its final judgment from which an appeal was not taken within the requisite 60 days, as required by Fed.R.Civ.P. 73(a). *See id.* at 230, 78 S.Ct. at 676.

The Supreme Court rejected Schaefer's argument that the memorandum decision of April 14 was a final judgment, holding instead that the actions of the district court judge on that date did not clearly evidence the district court's intention to render a final decision. *See id.* at 235–36, 78 S.Ct. at 679–80. It reasoned that though "there is no statute or rule that specifies the essential elements of a final judgment, ... it is obvious that a final judgment for money must, at least, determine, or specify the means for determining, the amount." *Id.* at 233, 78 S.Ct. at 678. Accordingly, the Supreme Court continued, where a court does not indicate the amount of money to be awarded

to the prevailing litigant, it "reveals doubt, at the very least, whether the [court's action] was a '*complete* act of adjudication' " from which an appeal may be brought. *Id.* at 234, 78 S.Ct. at 678–79; *accord Zink v. United States,* 929 F.2d 1015, 1019–20 (5th Cir.1991) (per curiam).

The IRS points out that much like the April 14 opinion regarded as not final in *Schaefer,* the judgments here at issue do not specify the dollar amount of the taxpayer's refund. It asserts that *Schaefer* requires us to hold that this lack renders the district court's June 17, 1992 judgments non-final and deprives us of appellate jurisdiction.

■ Contrary to the government's assertion, *Schaefer* does not establish that the presence of a specific dollar figure in a judgment is the *sine qua non* of finality. Rather, that case merely states that the expression of an amount to be awarded serves as significant indicia of finality. No rule or statute prescribes the essential elements of a final judgment, *see McDermitt v. United States,* 954 F.2d 1245, 1249 (6th Cir.1992); *see also* 10 Charles A. Wright et al., *Federal Practice & Procedure* § 2652 (2d ed. 1983), and *Schaefer* itself expressly disavowed mandating any such rule. *See* 356 U.S. at 233, 78 S.Ct. at 678 (" '[n]o form of words and no peculiar formal act is necessary to evince [the] rendition [of a judgment]' ") (quoting *United States v. Hark,* 320 U.S. 531, 534, 64 S.Ct. 359, 361, 88 L.Ed. 290 (1944)).

■ Thus, where other indicators are present, the lack of reference to a specific amount of money *standing alone* will not render a judgment non-final and hence non-appealable. Finality is determined on the basis of pragmatic, not needlessly rigid *pro forma,* analysis. This approach better serves the overriding aim of the Federal Rules of Civil Procedure to dispose expeditiously and inexpensively of every action. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510 (1962); *see also Bankers Trust Co. v. Mallis,* 435 U.S. 381, 386–87, 98 S.Ct. 1117, 1121, 55 L.Ed.2d 357 (1978) (per curiam) (eschewing technical interpretation of the rules of finality for a common-sense approach). Whether a judgment is final turns less on the presence of a dollar figure in the document itself than on the intent of the district court judge. *See Schaefer,* 356 .U.S. at 232–33, 78 S.Ct. at 677–78. What essentially is required is some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as it is concerned, is the end of the case. *See Paliaga v. Luckenbach S.S. Co.,* 301 F.2d 403, 407 (2d Cir.1962); *accord Mallis,* 435 U.S. at 385 n. 6, 98 S.Ct. at 1120 n. 6; Wright et al., *supra.*

There is ample indication that the district court intended its June 17, 1992 judgments to be its dispositive action in this case. The judgments on their face demonstrate that the court had fully adjudicated all the issues before it, leaving nothing remaining for it to do with respect to this litigation. *See Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 373, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981); *see also Arp·Films, Inc. v. Marvel Entertainment Group,* 905 F.2d 687, 689 (2d Cir.1990) (per curiam) (noting final decision leaves nothing for trial court to do but ministerial tasks). The timing of the judgments—issued shortly after the court denied the government's motions for j.n.o.v. and for a new trial—also confirms that the trial court was closing the litigation. Its rejection of the government's motion to alter or amend the November 4, 1991 judgments further reveals that it deemed its June 17, 1992 judgments to have addressed the government's objections and to have cured any and all defects.

Taking a practical view of both the wording of the judgments and the surrounding circumstances, it is clear that Judge Daly's June 17 actions were intended to be final. As a consequence, this appeal properly has been pursued from final judgments of the district court and appellate jurisdiction exists under 28 U.S.C. § 1291. We turn attention now to the merits.

## II  Responsibility for Payment of Withholding Taxes

The IRS initially asserts that in light of the evidence establishing Fiataruolo's and Veno's significant control over C & C Security's finances, the two taxpayers were clearly

persons responsible for paying the withholding taxes within the meaning of 26 U.S.C. § 6672. It believes the district court erred in denying its motion for j.n.o.v. and contends that the case should be remanded on the sole question of whether the taxpayers' failure to pay taxes was "willful."

We review *de novo* the denial of a motion for judgment notwithstanding the verdict, *see Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1212 (2d Cir.1993), and in so doing, we are bound to look at the evidence in the light most favorable to the non-moving parties, here Veno and Fiataruolo. *See Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 508 (2d Cir.1989). The issue we must decide thus is the same as that presented to the district court: whether the evidence points so clearly in one direction that—not considering the credibility of the witnesses or the weight of the evidence— there can be only one conclusion that reasonable and fair-minded people could have reached. *See Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038–39 (2d Cir.1992); *see also Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970). In answering this query, we find it helpful to examine the principles governing liability under § 6672.

### A. General Principles

■ The Internal Revenue Code requires employers to withhold federal income and social security taxes from their employees' wages. These withheld sums are held "in trust for the United States," 26 U.S.C. § 7501(a) (1988), and must be paid over to the IRS on a quarterly basis. *See Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). An employer who fails to remit withheld sums to the government is liable for the taxes that should have been paid. Once an employer withholds taxes, the employee is given credit for their payment, and the government has no recourse against the employee, even when the employer does not turn over to the United States the withheld amounts. *See Bowlen v. United States*, 956 F.2d 723, 726 (7th Cir.1992).

To protect the government from losses sustained by employers' failure to remit withholding taxes, Congress enacted § 6672 of the Internal Revenue Code, 26 U.S.C. § 6672, which gives the IRS another source from which to collect unpaid taxes. *See Gephart v. United States*, 818 F.2d 469, 473 (6th Cir.1987) (per curiam). This provision provides "a mechanism for shifting the tax liability of the employer to each individual responsible for the nonpayment." Edward A. Nolfi, Annotation, *When Are Persons Other than Owners, Directors, Officers, and Employees Potentially Liable for Penalties Under IRC § 6672 (26 USCS § 6672), Concerning Failure to Collect and Pay Over Tax*, 84 A.L.R.Fed. 170, 177 (1987) [*ALR Annotation*]. As such, § 6672 is a vital collection tool that cuts through an employer's organizational structure and allows the IRS to impose liability directly and individually on those persons responsible for the tax delinquency. *See Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir.1984).

■ In pertinent part, § 6672 provides

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall ... be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). Under this section, a party may be held liable for unpaid withholding taxes if: first, he is the "responsible person" for collection and payment of the employer's taxes, *see Godfrey*, 748 F.2d at 1574 & n. 4, and second, he "willfully" failed to comply with the statute. *See Hochstein v. United States*, 900 F.2d 543, 546 (2d Cir. 1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992). The person against whom the IRS assesses a § 6672 tax penalty has the burden of disproving, by a preponderance of the evidence, the existence of one of these two elements. *See id.; see also McDermitt*, 954 F.2d at 1251.

■ Under the first prong of the test, courts generally take a broad view of who qualifies as a responsible person. *See Denbo*

*v. United States,* 988 F.2d 1029, 1032 (10th Cir.1993); *Barnett v. IRS,* 988 F.2d 1449, 1454 (5th Cir.1993). Such determination of responsibility is based upon the individual's "status, duty and authority" to insure compliance with the employer's tax withholding obligations. *Raba v. United States,* 977 F.2d 941, 943 (5th Cir.1992); *accord Barton v. United States,* 988 F.2d 58, 59 (8th Cir.1993). The core question "is whether the individual has *significant control* over the enterprise's finances." *Hochstein,* 900 F.2d at 547 (emphasis added); *accord, e.g., Kinnie v. United States,* 994 F.2d 279, 283 (6th Cir.1993).

■■■ This need for a responsible party to have significant control does not, at least in this Circuit, translate into a requirement of absolute authority. *See Hochstein,* 900 F.2d at 547. Instead, the term "significant control" is meant to encompass "all those connected closely enough with the business to prevent the [tax] default from occurring." *Bowlen,* 956 F.2d at 728. Hence, to be held responsible under § 6672 a person need not have the final word on which creditors are to be paid or how funds are to be allocated. At the same time, the significant control test is not meant to ensnare those who have merely technical authority or titular designation. *See Barton,* 988 F.2d at 59; *Gustin v. United States,* 876 F.2d 485, 492 (5th Cir.1989).

■■■ Significant control may be shared by several people within a company, all of whom may be found responsible for a tax delinquency. *See Kinnie,* 994 F.2d at 284. Such authority may not be delegated to others in order to avoid liability. *See, e.g., Hornsby v. IRS,* 588 F.2d 952, 953–54 (5th Cir.1979) (per curiam). The inquiry focuses on whether an individual could have exerted influence, and delegation or avoidance of duties will not deflect its scope.

■■■ A number of factors have been assessed when determining whether an individual has the requisite control over an enterprise to be found as a matter of law a responsible person under the statute. Courts have examined whether the person: (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority. *See Barnett,* 988 F.2d at 1455; *Bowlen,* 956 F.2d at 728; *Hochstein,* 900 F.2d at 547. It should be noted that a person need not hold any particular position in a business and need not actually exercise authority to be held a responsible party for the payment of withheld taxes. The question of control over the employer's finances must be answered in light of the totality of the circumstances; no one factor is determinative. *See generally ALR Annotation, supra,* at 177–79.

### B. Principles Applied

■■■ We turn to an analysis of these factors under the specific circumstances of this case. An examination of the facts in a light most favorable to Fiataruolo and Veno demonstrates that the jury could have found that they adequately established by a preponderance of the evidence that they did not possess significant control over C & C Security's finances so as to be deemed responsible persons under § 6672.

Applying the tests for significant control, we begin by noting that neither taxpayer was an officer, employee, or director of C & C Security. As stated above, the Finance Contract expressly forbade Angelo Veno from representing himself as a member of C & C Security. Second, neither Fiataruolo nor Veno owned any shares or held an equity stake in C & C Security; they were instead project financiers whose loans were secured by formal notes that were to be repaid at an agreed upon schedule and rate. Third, they had no authority to hire or fire employees of the contractor, did not regularly visit job sites, supervise office staff, or choose subcontractors and suppliers. These responsibilities and all other daily management functions apparently were vested with Del Cernuda. Fourth, control over the daily accounts and distribution records was maintained by Dian and Francis Cifuni, who performed all ac-

counting functions for C & C Security. The IRS argues to the contrary, pointing out that appellees hired Wayne Troy to monitor those books. But, evidence in the record makes clear that Troy was merely a part-time employee whose role was not to oversee the daily finances of C & C Security, but was instead to ensure that co-venture funds were not commingled with other C & C Security moneys.

The IRS notes that Fiataruolo and Veno had authority to sign checks, which it thinks indicates that they had significant control over finances. A careful look at this factor reveals that this authority applied solely to one bank account in Connecticut. C & C Security maintained other bank accounts in New York over which the appellees had no control. They could not sign checks on these accounts, nor were they authorized to review the bank statements. Moreover, even on the Connecticut account, checks were prepared primarily by Dian Cifuni. The trial proof shows that Fiataruolo and Veno reviewed these checks only as project managers, that is, they sought to determine whether funds were used exclusively for co-venture financed construction jobs. In this context, check-signing authority and actual check-signing are slender reeds on which to rest a liability determination under § 6672. *See Barrett v. United States*, 580 F.2d 449, 453, 217 Ct.Cl. 617 (1978) (per curiam).

The government insists that the Finance Contract, which designated Veno Construction the "Finance Manager," afforded both appellees significant control over C & C Security's funds. The jury was not required to read the Finance Contract as creating such control. An oblique titular designation in the Finance Contract cannot be used as a sufficiently powerful lever to impose liability as a matter of law. *Cf. Godfrey*, 748 F.2d at 1576 (taxpayer's normal activities within proper sphere of role as chairman of board do not in themselves give rise to a duty under § 6672). The contract—which does not mention Angelo Fiataruolo—calls for Veno Construction to undertake accounting functions only for those specific projects with which it was associated. Neither this 16–page agreement nor its antecedent, the two-page Co–Venture letter, was designed to transfer all C & C Security auditing and cost control functions to the taxpayers, and ample evidence permitted the jury to infer that no such repositioning of responsibilities took place. Rather, C & C Security continued to operate as a separate corporate entity, with the Cifunis retaining general decision-making authority over when, to whom and in what order payments were to be made to creditors.

Cases the IRS cites where individuals have been held responsible under § 6672 are distinguishable. In most of them one of the key factors indicating significant control of an enterprise's finances was the taxpayer's position either as a member of that company's management or as a shareholder, director, or officer of the business. *See Barton*, 988 F.2d at 59; *ALR Annotation, supra*, at 177 ("generally, responsible persons are high corporate officials charged with general control over corporate business affairs"). This was the situation in *Hochstein*, 900 F.2d at 547, where the undisputed facts indicated that the taxpayer was the employer's controller, and as such was responsible for overseeing preparation of payroll and filing tax returns. Similarly in *Barnett v. IRS*, 988 F.2d at 1455, the responsible person owned 20 percent of the employer's stock, served as both a director and a corporate vice president, managed day-to-day operations, and hired and fired employees.

In cases not involving high company officials, liable taxpayers either have had a clear role in the management and regulation of the delinquent firm's affairs or have handled the bookkeeping and auditing functions. For example, the Third Circuit in *Quattrone Accountants, Inc. v. IRS*, 895 F.2d 921, 927 (3d Cir.1990), upheld the lower courts' rulings that outside accountants were responsible for their client's failure to pay withholding taxes because these accountants paid their client's monthly bills without prior approval, provided their client with daily financial advice, and prepared and filed their client's tax returns. In *Adams v. United States*, 504 F.2d 73, 76–77 (7th Cir.1974), the court reversed the granting of summary judgment in favor of a lender because there was evidence that could

permit the finder of fact to infer that the lender exercised final authority over the use of an employer's funds on a daily basis, and at one point "determined to discontinue" the payment of withholding taxes. In *McDermitt v. United States*, 954 F.2d at 1251, a business outsider was deemed responsible in view of the fact that he established the company, appointed the corporate officers, and "was in every sense the boss."

The evidence presented to the jury in this case supports its finding of no liability, and does not require the conclusion as a matter of law that Fiataruolo and Veno had significant control over C & C's finances. Fiataruolo and Veno were neither key officials within C & C Security, nor participants in the management of the delinquent contractor's bookkeeping affairs. We recognize that casting a wide net of responsibility under § 6672 serves the important prophylactic purpose of encouraging all those with authority to stay abreast of a company's tax withholding and payment obligations. *See Barnett*, 988 F.2d at 1456–57. Further, we appreciate the importance of not creating holes within this statutory netting through which responsible individuals may escape liability. Nevertheless, these policy reasons will not serve to ensnare—like a drift net in the ocean—remote parties like Veno and Fiataruolo outside the corporate taxpayer's domain. Examining the evidence as to the totality of the circumstances, we are persuaded that the district court properly denied the government's motion for j.n.o.v., and that the jury was entitled to find that the contractor's finances were handled in a manner and under circumstances beyond these taxpayers' individual control.

### III  Expert Testimony

■ The government further contends that the district court erred in allowing Fiataruolo's expert witness, Lewis Cohen, to offer a legal conclusion based on inadequately explored criteria, that is, Cohen should not have been permitted to testify that Fiataruolo was not a responsible person under § 6672. The IRS insists this error mandates a new trial, not only for Fiataruolo but also for Veno because of their essentially similar roles in the co-venture.

■ Complaining of an error in the admission of a witness' testimony into evidence shoulders an appellant with a weighty burden. *See, e.g., United States v. Campino*, 890 F.2d 588, 593 (2d Cir.1989), *cert. denied*, 494 U.S. 1068, 110 S.Ct. 1787, 108 L.Ed.2d 788 (1990). District courts have broad discretion to make evidentiary determinations, and their rulings on admissibility of proof are upheld unless "manifestly erroneous." *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) (Friendly, J.), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *accord United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir.1991). No such error was committed here. The Federal Rules of Evidence allow the trial court to admit expert testimony when it thinks that testimony will assist the triers of fact in understanding the case. *See* Fed.R.Evid. 702. Experts may testify on questions of fact as well as mixed questions of fact and law. This sort of testimony is not objectionable merely "because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704.

■ The liberal rules governing expert testimony nonetheless were not designed to open the door for the admission of all sorts of expert opinions thereby trespassing on the province of the jury and the trial court. *See* Note, *Expert Legal Testimony*, 97 Harv. L.Rev. 797, 797–98 (1984). The Advisory Committee Notes accompanying the rules of evidence make plain that courts should guard against

the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also [should] stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

Fed.R.Evid. 704 (Advisory Committee Notes). We have relied on this language to hold that Fed.R.Evid. 704 "was not intended to allow experts to offer opinions embodying legal conclusions." *United States v. Scop,* 846 F.2d 135, 139 (2d Cir.), *rev'd in part on other grounds,* 856 F.2d 5 (2d Cir.1988).

Accordingly, in *Andrews v. Metro North Commuter R.R. Co.,* 882 F.2d 705, 708–09 (2d Cir.1989), we determined that a district court abused its discretion when it permitted an expert to testify in a train accident suit that the railroad was negligent in its operation of the train. Determination of negligence, we stated, rested on a finding of a breach of duty, the existence and nature of which had to be defined as a matter of law by the trial judge. Because the expert did not state the legal criteria for his opinion on negligence there was no way of knowing whether his conclusion was based on a correct or erroneous legal standard. *Id.*

In *United States v. Scop,* 846 F.2d at 140, we held it error to allow an expert in securities trading to state repeatedly that the defendants were active and material participants in the manipulation of stock and had engaged in a manipulative and fraudulent scheme in furtherance of their goals. The expert's testimony deliberately tracked the language of the relevant regulations and statutes, was not couched in even conclusory factual statements, and was not helpful to the jury in carrying out its legitimate function. Rather, the expert's opinions were "calculated to 'invade the province of the court to determine the applicable law and to instruct the jury as to that law.'" *Id.* (quoting *FAA v. Landy,* 705 F.2d 624, 632 (2d Cir.), *cert. denied,* 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983)).

When viewed in isolation, Cohen's testimony on Fiataruolo's responsibility lies near the border, close to a prohibited invasion. But when examined in the proper context, it does not cross the line. The testimony was offered as part of a longer exposition on Dian Cifuni's violation of established accounting principles. Expert Cohen went through and explained in some detail the payroll checks and bank account statements, providing factual explanations for those procedures that were being followed at C & C Security. Then he offered his opinion based on those procedures as to whether Fiataruolo was responsible under § 6672. Cohen's testimony gave the jury helpful information beyond a simple statement on how its verdict should read. He couched his opinion specifically "on the evidence that I looked at and the work that I did." Thus, unlike the impermissible statements in *Scop,* Cohen's opinion was not a simple bald assertion of the law and was not designed to invade the province of the trial court. *Cf. Karns v. Emerson Elec. Co.,* 817 F.2d 1452, 1459 (10th Cir.1987) (finding admissible testimony of expert who "explained the bases for his opinions in sufficient detail to permit the jury to independently evaluate his conclusions"); *United States v. Milton,* 555 F.2d 1198, 1204 (5th Cir.1977) (finding admissible similar testimony that combined factual explanations and legal conclusions).

Here the trial court also admonished the jury that Cohen's views were "not binding." To be sure, such a charge cannot always cure the trial court's error in allowing inadmissible evidence. *See Andrews,* 882 F.2d at 708. Yet, in this case the instruction adequately protected against the jury's giving undue weight to Cohen's opinion. *Cf. United States v. Bilzerian,* 926 F.2d 1285, 1295 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991). As a consequence, the admission of Cohen's testimony was not an abuse of the trial court's discretion.

## CONCLUSION

We have considered the other arguments raised by the parties and find them all without merit. For the foregoing stated reasons, we affirm the judgment of the district court but remand this case so that the district court may complete the purely "ministerial task[ ]," *Arp Films, Inc. v. Marvel Entertainment Group,* 905 F.2d at 689, of calculating the dollar amount of the awards due to Fiataruolo and Veno. Costs on this appeal to Fiataruolo and Veno without attorney's fees.